IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JAMES G., )
 )
        Plaintiff, )
 )
v. ) 1:22CV956
 )
MARTIN J. O'MALLEY,[1] )
Commissioner of Social Security, )
 )
        Defendant. )

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff James G. ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The Parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.    PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on October 23, 2020, alleging a disability onset date of February 19, 2019. (Tr. at 25, 226-27.)[2] Plaintiff's application was denied initially (Tr. 89-96, 111-20) and upon reconsideration (Tr. at 97-104, 122-31).

---

[1] On December 20, 2023, Martin J. O'Malley was sworn in as Commissioner of Social Security, replacing Acting Commissioner Kilolo Kijakazi. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should be substituted for Kilolo Kijakazi as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #4].

Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 132.) On January 26, 2022, Plaintiff, along with his attorney, attended the subsequent telephonic hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at 25, 45-88.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 40), and on September 14, 2022, the Appeals Council denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

II. <u>LEGAL STANDARD</u>

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." <u>Hines v. Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." <u>Hancock v. Astrue</u>, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets and quotation omitted).

"Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1993) (internal quotation omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation omitted). "If there is evidence to justify a refusal to direct a

2

verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 *et seq.*, provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 *et seq.*, provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

3

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, the claimant is disabled. Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since his alleged onset date of February 19, 2019. The ALJ therefore concluded that Plaintiff met his burden at step one of the sequential evaluation process. (Tr. at 28.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> degenerative disc disease; obstructive sleep apnea; and obesity[.]

(Tr. at 28.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 30-31.) Therefore, the ALJ assessed Plaintiff's RFC and determined that he could perform a range of light work, defined as follows:

> Specifically, [Plaintiff] can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; can sit up to 6 hours in an 8-hour workday; can stand and/or walk up to 6 hours in an 8-hour workday; can frequently push and/or pull with the bilateral upper extremities; can frequently perform handling, fingering, and overhead reaching with the bilateral upper extremities[;] can occasionally climb ladders, ropes and scaffolds, can frequently climb ramps and

5

> stairs; can frequently balance, as that term is defined in the Dictionary of Occupational Titles, can frequently stoop, kneel, and crouch, but only occasionally crawl. He should avoid concentrated exposure to fumes, odors, gases, poor ventilation, or other pulmonary irritants, and should avoid even occasional exposure to workplace hazards such as moving machinery and unprotected heights.

(Tr. at 31.) At step four of the analysis, the ALJ found, based on the above RFC and the vocational expert's testimony, that Plaintiff was unable to perform any of his past relevant work. (Tr. at 38.) However, the ALJ determined at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, he could perform other jobs available in significant numbers in the national economy. (Tr. at 39.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 40.)

Plaintiff now contends that the ALJ erred in two respects when assessing Plaintiff's RFC. First, he argues that "the ALJ erred by failing to explain why she did not include a time off task limitation due to medication side effects and the need to recline in the [RFC] assessment." (Pl.'s Br. [Doc. #9] at 1.) Second, Plaintiff asserts that "the ALJ erred by failing to account for Plaintiff's limited ability to rotate, extend and flex his neck in the RFC." (Pl.'s Br. at 1.) The Court considers these claims together because they all relate to the setting of the RFC.

As set out above, "[a] Social Security claimant's RFC represents 'the most [he] can still do despite [his] limitations.'" Dowling v. Comm'r of Soc. Sec. Admin., 986 F.3d 377, 387 (4th Cir. 2021) (quoting 20 C.F.R. § 416.945(a)(1)). In assessing a claimant's RFC, the ALJ must consider that individual's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4).

As Social Security Ruling ("SSR") 96-8p instructs, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including the functions listed in the regulations. Social Security Ruling 96-8p: Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p, 61 Fed. Reg. 34474, 34475, 1996 WL 374184, at *1 (July 2, 1996). "Only after such a function-by-function analysis may an ALJ express RFC in terms of the exertional levels of work." Monroe v. Colvin, 826 F.3d 176, 179 (4th Cir. 2016) (internal quotation omitted). Further, the "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 61 Fed. Reg. at 34478, 1996 WL 374184, at *7. An ALJ must "both identify evidence that supports his conclusion and build an accurate and logical bridge from that evidence to his conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal brackets, emphases, and quotation omitted).

The Fourth Circuit has noted that a *per se* rule requiring remand when the ALJ does not perform an explicit function-by-function analysis "is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)). Rather, remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio, 780 F.3d at 636 (quoting Cichocki, 729 F.3d at 177).

7

The court in Mascio concluded that remand was appropriate because it was "left to guess about how the ALJ arrived at his conclusions on [the claimant's] ability to perform relevant functions" because the ALJ had "said nothing about [the claimant's] ability to perform them for a full workday," despite conflicting evidence as to the claimant's RFC that the ALJ did not address. Mascio, 780 F.3d at 637. The Fourth Circuit has further explained that "a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." Thomas v. Berryhill, 916 F.3d 307, 311 (4th Cir. 2019). The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Monroe, 826 F.3d at 189 (quoting Mascio, 780 F.3d at 636).

In the present case, Plaintiff contends that the ALJ failed to include limitations relating to his contested abilities to rotate, extend, and flex his neck or, in the alternative, explain the omission of such limitations. Plaintiff further argues that the ALJ failed to explain why she omitted limitations relating to Plaintiff's alleged need to recline and medication side effects, including time off task. Ultimately, none of these omissions require remand under Mascio, Dowling, and their progeny.

In setting the RFC, the ALJ noted Plaintiff's testimony that he has a neck injury and neck pain that makes it "difficult for him to turn his neck, look down, or look up." (Tr. at 32.) The ALJ also quoted Plaintiff's testimony about his need to recline, specifically that he "has to lay down on his left side 'in a weird position to relieve pressure.'" (Tr. at 32.) The ALJ also noted Plaintiff's testimony that he "takes muscle relaxers twice a day but avoids pain pills as he does not want to become addicted." (Tr. at 32.)

8

The ALJ then considered the medical evidence at length, which reflected initial visits and imaging in February/March 2019, chiropractor visits in 2019 and 2020, several visits to an orthopedist in July/August 2020, a Consultative Examination in February 2021, along with ongoing healthcare at the VA throughout the relevant period. As explained by the ALJ, these records reflect that although the orthopedist noted significant findings and offered surgery in July 2020, at Plaintiff's last visit with the orthopedist in August 2020:

> [Plaintiff] reported to Dr. Daubert on August 31, 2020 that "his neck pain has significantly improved with stretching and using a roller to decompress." His neck range of motion was now "fairly good" and he was "now able to bend over, when he was unable to in the past." On examination, Dr. Daubert noted the claimant as having intact strength in his bilateral upper extremities, improved bilateral range of motion of his neck and normal reflexes, though the Hoffman sign was still positive. He added that the claimant was not ready to consider surgery. They did agree to obtain a CT angiogram "to track the position of the vertebral artery" and to follow-up in three months.

(Tr. at 35, 329-31.) Plaintiff did not return to the orthopedist, and at a visit four months later at the VA, he confirmed his continued improvement, noting that:

> The claimant was seen by Dr. Paruchuri with the Kernersville VA Clinic on December 17, 2020. He reported "doing better of late with significant improvement in his pain levels in the neck and lower back" which he attributed to his chiropractic treatment sessions. He denied having any new weakness in the extremities and Dr. Paruchuri observed that [Plaintiff] was "actually ambulating quite well and is able to do most of his daily activities ... including yardwork." He noted [Plaintiff's] gait was normal, and there was no paraspinal tenderness in the lumbosacral region. Similarly there were no focal motor deficits, and the claimant's extremities had no edema and distal pulses were palpable.

(Tr. at 32, 592) (omission in original). The ALJ also considered the results of the Consultative Examination two months later in February 2021:

> On February 2, 2021, [Plaintiff] underwent a consultative medical examination with Mohammed Ali-Eltom, M.D. He reported having chronic neck pain and back pain, and feeling numbness in his hands and feet. He can drive himself,

9

take care of personal needs, and go shopping, but has limitations carrying heavy weights and he "feels stiff and lays down" after mowing the yard. Dr. Ali-Eltom observed [Plaintiff] having a steady and symmetric walking gait, but he was unable to rise from a seated position without arm assistance. He could squat with moderate difficulty, but his toe and heel walking and tandem walk were normal. [Plaintiff's] muscle strength was full in all muscle groups, and his muscle bulk and tone were normal. Sensory exams showed light touch and pinprick were grossly intact throughout the bilateral upper and lower extremities. Dr. Ali-Eltom diagnosed the claimant with cervical myelopathy with radiculopathy, lumbar spinal canal stenosis, and a history of calcification of the longitudinal ligament.

(Tr. at 35-36, 505-09.) The ALJ also found persuasive the opinions of the state agency medical consultants, Dr. Karen Roane and Dr. Nancy Simpkins. Dr. Roane and Dr. Simpkins both reviewed all of the imaging cited by Plaintiff, as well as the medical records and the Consultative Examination, and found that Plaintiff was capable of working, specifically:

> Karen Roane, M.D., a State agency medical consultant, examined the claimant's medical records on February 16, 2021 and found that the claimant could perform work at the light exertional level except he could frequently but not constantly push and pull due to his chronic neck pain, can frequently engage in balancing, stooping, kneeling, crouching, crawling, and climbing of stairs and ramps, but can occasionally climb ropes, ladders, or scaffolds. He is also limited to frequent but not constant reaching overhead, and should avoid concentrated exposure to fumes, odors, gases, poor ventilation, or other pulmonary irritants, as well as to workplace hazards such as moving machinery and unprotected heights. On June 29, 2021, Nancy Simpkins, MD, another State agency medical consultant, also reviewed the available evidence and endorsed Dr. Roane's findings. The undersigned finds these findings mostly persuasive, but finds that the claimant's cervical degenerative disc disease does support additional limitations regarding the claimant's capacity to perform handling and fingering to the extent described above.

(Tr. at 37-38, 91-95, 99-103) (internal citations to record omitted). The ALJ then set the RFC, specifically based on:

> the extensive objective diagnostic imaging reports, the treatment notes of the claimant's primary care physician, his examining orthopaedic specialist, and the consulting medical examiner Dr. Ali-Eltom, the claimant's noted response to treatment, especially chiropractic care, and the findings of the State agency

> medical consultants. Such a residual functional capacity reasonably accommodates the claimant's consistent and supported limitations.

(Tr. at 38.) Thus, this is not a case where the ALJ failed to explain her reasoning , and the evidence cited by the ALJ provides substantial evidence to support her conclusions.

With regard Plaintiff's ability to rotate and extend his neck, Plaintiff relies on an unpublished case from the Eastern District of North Carolina. In Salter v. Kijakazi, No. 2:20-CV-43-BM, 2021 WL 4501871, at *4-5 (E.D.N.C. Sept. 30, 2021), the court found that "at least contradictory evidence exist[ed] regarding [the plaintiff's] ability to rotate and twist his neck" and that "[t]he assessment of this function [was] critically relevant to, and potentially outcome determinative of, [the plaintiff's] disability status." The court concluded that it was "incumbent upon the ALJ to assess [the plaintiff's] ability to rotate and twist his neck, and to explain whether [the plaintiff] requires any additional functional limitation in his RFC related to this ability." Salter, 2021 WL 4501871, at *5. However, in Salter, at least some of the medical treatment and opinion evidence suggested that the plaintiff in that case would require neck-related limitations which were ultimately omitted, without explanation, from the RFC assessment. In contrast, in the present case, as set out in the ALJ's decision, the providers who issued medical opinions in this case all acknowledged that Plaintiff experienced chronic neck pain which caused significant limitations. The ALJ, the state agency consultants, and the consultative examiner, Dr. Mohammed Ali-Eltom, all recounted Plaintiff's MRI results and physical examinations related to his cervical impairments. In light of these findings, Dr. Ali-Eltom opined that Plaintiff was only capable of work at the light exertional level and that he could only perform occasional climbing and crawling. (Tr. at 509.) The state agency medical consultants at the initial and reconsideration levels issued similar opinions based on a review

11

of the entire medical record. The state agency consultant at the initial level, Dr. Karen Roane, set out at length Plaintiff's imaging results (Tr. at 91), treatment records, and the results of the Consultative Examination (Tr. at 93), and specifically concluded that Plaintiff could still perform light work involving standing and/or walking for 6 hours and sitting for 6 hours in an 8 hour workday, but was limited to frequent-but-not-constant pushing and pulling "due to chronic neck pain" and light exertion "given pain/cervical stenosis." (Tr. at 93.) Dr. Roane further limited Plaintiff to only occasional ladders and ropes due to "cervical spine disease with painful neck rom [range of motion]." (Tr. at 94.) In addition, Dr. Roane limited Plaintiff to "no unprotected heights given cervical disc disease with painful neck rom [range of motion]." (Tr. at 94.)

On reconsideration, the state agency consultant Dr. Nancy Simpkins similarly reviewed the imaging, the treatment records, and the Consultative Examination, and similarly concluded that Plaintiff could still perform light work involving standing and/or walking for 6 hours and sitting for 6 hours in an 8 hour workday, but was limited to frequent-but-not-constant pushing and pulling "due to chronic neck pain" and light exertion "given pain/cervical stenosis." (Tr. at 101.) Dr. Simpkins further limited Plaintiff to only occasional ladders and ropes due to "cervical spine disease with painful neck rom [range of motion]" (Tr. at 102), and limited Plaintiff to "no unprotected heights given cervical disc disease with painful neck rom [range of motion]." (Tr. at 103.) Thus, these physician opinions specifically considered Plaintiff's limited range of motion in his neck, and included provisions in the proposed RFC to account for those limitations. As noted above, the ALJ found these opinions persuasive and included all of these limitations, but also determined that Plaintiff's "cervical degenerative disc disease

12

does support additional limitations regarding [his] capacity to perform handling and fingering." (Tr. at 37-38.) No provider, treating or otherwise, opined that Plaintiff required any additional neck-related limitations. Thus, given the extensive exertional, postural, handling, and environmental limitations already included in the RFC and expressly based, in large part, on Plaintiff's neck impairment, the Court finds no basis for remand.

Plaintiff also challenges the ALJ's failure to include his claimed limitations regarding the need for both time off task and a reclined position. Both of these alleged limitations rest entirely on Plaintiff's subjective complaints. In pertinent part, and as recounted in the ALJ's decision, Plaintiff testified that, if he "sits in one position for too long he will get a sharp pain up his right side 'all the way up to [his head]'" and "has to lay down on his left side 'in a weird position to relieve [the] pressure.'" (Tr. at 32.) He typically uses either a bed with pillows or a recliner to achieve the "semi-fetal position" in which he "stay[s] most of the time." (Tr. at 69.) In terms of time off task, Plaintiff testified that he dislikes taking pills, and that he has consistently declined taking the pain pills prescribed to him. (See Tr. at 32, 72-73.) However, he typically takes muscle relaxers twice a day, "[u]nless [he has] to go somewhere," in which case he avoids taking them because they make him feel tired. (Tr. at 32, 73.)

Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304, at *10 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. § 404.1529. Moreover, in Arakas v.

13

Commissioner, Social Security, 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4-5. SSR 16-3p recognizes that "symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

983 F.3d at 95 (internal brackets omitted).

Here, the ALJ considered Plaintiff's subjective allegations, including pain and fatigue due to medication use, and found as follows:

> [Plaintiff] does have underlying medically determinable impairments that could and reasonably do cause some symptomatology. However, the pivotal question is not whether such symptoms exist, but whether those symptoms occur with such frequency, duration or severity as to reduce [Plaintiff's] residual functional capacity as set forth above or to preclude all work activity on a continuing and regular basis.
>
> In this case, a careful review of the record does not document sufficient objective medical evidence to substantiate the severity of the pain and degree of functional limitations alleged by [Plaintiff]. While [Plaintiff] was injured in a motor vehicle accident that coincided with his alleged onset date of disability, he has benefited from conservative treatment. Although a surgeon did recommend a spinal fusion, [Plaintiff] declined to have that surgery and treatment notes at the time show his condition was stable, his symptoms tolerable, and his ability to perform activities fairly robust. Contrary to

14

> [Plaintiff's] testimony, the record does not show that he was advised that a spinal fusion would leave him in more pain than before such surgery. He certainly has some ongoing limitations resulting from his injuries and his other impairments, but the range of light work provided should adequately account for his symptoms and limitations.

(Tr. at 36) (internal citation to record omitted). The ALJ then assessed the RFC in detail as set out above, and concluded that "to the extent that [Plaintiff] alleges limitations greater than those set forth in the current residual functional capacity finding, [the ALJ] finds those claims are not consistent with or supported by the evidence." (Tr. at 38.)

In short, the ALJ determined at the second step of her subjective symptom analysis that Plaintiff was not limited to the full extent he alleged. The ALJ provided an adequate basis for her findings regarding Plaintiff's alleged symptoms, and the Court finds no basis to disturb these determinations. Plaintiff specifically points to his testimony regarding his need to recline, but Plaintiff points to no evidence, including treatment notes or medical opinions, supporting his testimony that he must recline in a "semi-fetal position," let alone that he must do so for most of the day. With respect to side effects from his medication, Plaintiff testified that he typically took muscle relaxers twice daily, but he also stated that, when he had plans during the day, such as activities outside the house, he skipped his medication to avoid being tired. (Tr. at 73.) The record reflects that he was prescribed the muscle relaxer cyclobenzaprine (Flexeril), but Plaintiff does not point to any basis in the record to support his claim of daytime tiredness based on the Flexeril.[5] Ultimately, the ALJ made her symptom evaluation and assessed the

---

[5] Notably, the medical record reflects that in March 2019, shortly after his accident, Plaintiff reported feeling "motion sickness" that he attributed to the Flexeril, so his primary care doctor tried methocarbamol for muscle spasms in March/April of 2019, but the records note that methocarbamol "causes drowsiness," and it was discontinued in April 2019. (Tr. at 679, 682, 687, 692, 695, 697, 767.) Over a year later, in June 2020, Plaintiff was seen for back pain, and the provider noted that he was "apparently using an old RX of hydrocodone, which [they] encouraged him to avoid" and they instead prescribed the "intermittent cyclobenzaprine which he has

15

RFC in detail as set out above, and concluded that "to the extent that [Plaintiff] alleges limitations greater than those set forth in the current residual functional capacity finding, [the ALJ] finds those claims are not consistent with or supported by the evidence." Plaintiff provides no basis to question that determination.

Here, the ALJ reviewed the evidence, explained her decision, and clearly explained the reasons for her determination. That determination is supported by substantial evidence in the record. Plaintiff has not identified any errors that require remand, and Plaintiff's Motion to Reverse the Decision of the Commissioner should therefore be denied.

IT IS THEREFORE ORDERED that the Commissioner's decision finding no disability is AFFIRMED, that Plaintiff's Dispositive Brief [Doc. #9] is DENIED, that Defendant's Dispositive Brief [Doc. #12] is GRANTED, and that this action is DISMISSED with prejudice.

This, the 20th day of March, 2024.

/s/ Joi Elizabeth Peake
United States Magistrate Judge

---

used in the past." (Tr. at 618.) The records reflect that from June 2020 through November 2021, he was specifically prescribed cyclobenzaprine (Flexeril) "one tablet by mouth at bedtime as needed." (Tr. at 364, 369, 377, 517, 520, 525, 528, 540, 557, 561, 569, 575, 580, 584, 587, 592, 596, 600, 606, 746, 748, 757.) There is no record of any report of side effects, and no report of daytime tiredness as a result of the medication, which was to be taken at bedtime. Thus, the record indicates only two reports of side effects: a possible association with motion sickness in March 2019, but no subsequent reports of any such issues after it was prescribed from June 2020 to November 2021, and a noted side effect of drowsiness caused by a different medication that was prescribed only in March/April 2019.

16